LEON GREENBERG, ESQ., SBN 8094
RUTHANN DEVEREAUX-GONZALEZ, ESQ., SBN 15904
**LEON GREENBERG PC**
1811 South Rainbow Boulevard, Suite 210
Las Vegas, Nevada 89146
Telephone: (702) 383-6085
Facsimile: (702) 385-1827
leongreenberg@overtimelaw.com
ranni@overtimelaw.com

RACHELE R. BYRD
(*pro hac vice forthcoming*)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile:  (619) 234-4599
byrd@whafh.com

JON TOSTRUD
ANTHONY CARTER
(*pro hac vices forthcoming*)
**TOSTRUD LAW GROUP, PC**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  310/278-2600
Facsimile:  310/278-2640
jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

*Attorneys for Plaintiff and the Proposed Class*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| DAVID TEREZO, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| MGM RESORTS INTERNATIONAL, | |
| Defendant. | |

## I.    INTRODUCTION

1.      Plaintiff David Terezo ("Plaintiff") brings this class action in this Court against Defendant MGM Resorts International ("MGM" or "Defendant") for its failure to prevent a cyberattack that resulted in the theft and dissemination (the "Data Breach") of Plaintiff's and other similarly situated consumers' sensitive information, including, upon information and belief, their full names, dates of birth, addresses, email addresses, phone numbers, Social Security numbers and/or driver's license numbers ("Personally identifiable information" or "PII").[1, 2]

2.      Beginning on September 7, 2023 cyberattackers gained access to Defendant's network by impersonating an IT administrator and gaining access credentials. The cyberattackers then locked down Defendant's network preventing resort guests from using their electronic room cards, Wi-Fi, ATM kiosks, electronic gaming devices, and other resort services.

3.      Thus far, two competing cybercriminal groups have taken credit for the attack against Defendant. First, a hacking group known as "The Scatter Spider" took credit, on or about September 11, 2021, for accessing and acquiring "six terabytes of data from the systems of multi-billion-dollar casino operators MGM Resorts International[.]"[3] Second, a ransomware group known as ALPHV took credit, on or about September 14, 2023, for deploying a ransomware attack against Defendant and "download[ing] any and all exfiltrated materials," including "PII information contained in the exfiltrated data[]" involved in the cyberattack.[4]

4.      Defendant owns and operates casino gaming brands with resorts throughout the United States, which include dining, live entertainment, accommodations, shopping, and gaming.

---

[1]      Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[2]      *See*      https://www.bleepingcomputer.com/news/security/mgm-resorts-shuts-down-it-systems-after-cyberattack/ (last visited Oct. 2, 2023).

[3]      *See*      https://www.reuters.com/business/casino-giant-caesars-confirms-data-breach-2023-09-14/ (last visited Oct. 2, 2023).

[4]      *See* https://gist.githubusercontent.com/BushidoUK/20b81335c6729dc8e0b5997ca83fa35f/raw/a0697117e905f5094e7a5feae928806b2ba65b20/gistfile1.txt?ref=thestack.technology (last visited Oct. 2, 2023).

5.     The MGM Rewards loyalty program allows members to "earn rewards for your hotel stays, dining, slots, table games, and more. Then redeem your MGM Rewards Points to do it all over again, on [Defendant]."[5]

6.     Upon information and belief, individuals, including Plaintiff and Class members, who were consumers of Defendant's entertainment services or sought to join the MGM Rewards loyalty program are required to entrust Defendant with sensitive, non-public PII, without which Defendant could not perform its regular business activities, in order to obtain entertainment products and/or services from Defendant. Defendant retains this information for at least many years and even after the consumer relationship has ended.

7.     By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

8.     Defendant failed to adequately protect Plaintiff's and Class members PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect consumers' sensitive data. Hackers targeted and obtained Plaintiff's and Class members' PII because of its value in exploiting and stealing the identities of Plaintiff and Class members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

9.     Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiff and Class members; (ii) warn Plaintiff and Class members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts at least to negligence and violates federal and state statutes.

10.     Defendant disregarded the rights of Plaintiff and Class members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable

---

[5]     *See* https://www.mgmresorts.com/en/mgm-rewards.html (last visited Oct. 2, 2023).

measures, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class members was compromised through disclosure to an unknown and unauthorized third party.

11.     Plaintiff and Class members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

12.     Plaintiff and Class members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

13.     Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of himself and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## II.   PARTIES

14.     Plaintiff David Terezo is, and at all times relevant, has been a citizen of Woodbury, New York.

15.     Defendant is a Delaware corporation with its principal place of business located at 3600 South Las Vegas Boulevard, Las Vegas, Nevada 89109.

## III.   JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or

value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class member is a citizen of a state different from Defendant.

17.     This Court has jurisdiction over Defendant because it operates in this District.

18.     Venue is proper in this District under 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendant has harmed Class members residing in this District.

## IV.   FACTUAL ALLEGATIONS

### A. *Defendant's Business*

19.     Defendant owns and operates casino gaming brands with resorts throughout the United States, which include dining, live entertainment, accommodations, shopping, and gaming.

20.     As a necessary part of its regular business activities, Defendant collected and stored the PII of Plaintiff and Class members.

21.     As a condition of receiving its products and/or services, Defendant requires that consumers and/or members of its MGM Rewards program, including Plaintiff and Class members, entrust it with highly sensitive personal information.

22.     The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted PII of Plaintiff and Class members.

23.     Upon information and belief, Defendant made promises and representations to its consumers, including Plaintiff and Class members, that the PII collected from them would be kept safe and confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

24.     Indeed, Defendant's Privacy Policy provides: "Information maintained in electronic form that is collected by MGM Resorts International and any individual MGM Resort is stored on systems protected by industry standard security measures. These security measures are intended to protect these systems from unauthorized access."[6]

25.     Plaintiff and Class members provided their PII to Defendant with the reasonable

---

[6]     *See* https://www.mgmresorts.com/en/privacy-policy.html (last visited Oct. 2, 2023).

expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

26.     Plaintiff and the Class members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class members relied on the sophistication of Defendant to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class members value the confidentiality of their PII and demand security to safeguard their PII.

27.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class members from involuntary disclosure to third parties. Defendant has a legal duty to keep consumer's PII safe and confidential.

28.     Defendant had obligations created by the FTC Act, contract, industry standards, and representations made to Plaintiff and Class members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

29.     Defendant derived a substantial economic benefit from collecting Plaintiff's and Class members' PII. Without the required submission of PII, Defendant could not perform the services it provides.

30.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' PII from disclosure.

**B.  *The Data Breach***

31.     On September 11, 2023, MGM posted a message informing consumers that MGM experienced a "cybersecurity issue."[7] According to one cybercriminal group that has taken credit for the attack, the cybercriminals gained access to Defendant's systems by impersonating an employee to gain access credentials, a relatively simple social engineering attack.[8] Once the threat

---

[7]     CNN, *The MGM Resorts is operational after cybersecurity issue*, available at: https://www.cnn.com/2023/09/11/tech/mgm-resorts-down-security-outage/index.html         (last visited Oct. 2, 2023).

[8]     Tech Crunch, *Hackers claim MGM cyberattack as outage drags into fourth day,* available at:  https://techcrunch.com/2023/09/14/mgm-cyberattack-outage-scattered-spider/  (last   visited Oct. 2, 2023).

actors gained access to the network, the cybercriminals deployed ransomware designed to lock down Defendant's network as leverage to force Defendant to pay a ransom.

32.    The attack lasted at least ten days, during which MGM consumers reported being unable to use electronic room keycards, wireless internet, and ATM kiosks, make electronic payments, and use MGM resort services, and electronic gaming devices like slot machines were offline.[9]

33.    Worse still, the cyber attackers claim to have exfiltrated at least six terabytes of data, which on information and belief include the PII of Plaintiff and Class members, from Defendant's network.[10]

34.    A ransomware attack, like that experienced by Defendant is a type of cyberattack that is frequently used to target companies due to the sensitive data they maintain.[11] In a ransomware attack the attackers use software to encrypt data on a compromised network, rendering it unusable and demanding payment to restore control over the network.[12]

35.    Companies should treat ransomware attacks as any other data breach incident because ransomware attacks don't just hold networks hostage, "ransomware groups sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[13] As cybersecurity expert Emisoft warns, "[a]n absence of evidence of exfiltration should not be construed to be evidence of its absence [….] [T]he initial assumption should be that data may

---

[9]    WUSA9.com, *MGM Resorts computers back up after 10 days as analysts eye effects of casino cyberattacks*, available at: https://www.wusa9.com/article/news/nation-world/mgm-resorts-computers-restored-after-10-day-shutdown/507-960b53d2-c1c7-4c29-8fe7-e10b17a5d203 (last visited Oct. 2, 2023).

[10]    The Stack, *Las Vegas casino ransomware attacks: Okta in the spotlight as MGM slowly recovers*, available at: https://www.thestack.technology/mgm-okta-ransomware/ (last visited Oct. 2, 2023).

[11]    ZDNET.com, *Ransomware warning: Now attacks are stealing data as well as encrypting it*, available at: https://www.zdnet.com/article/ransomware-warning-now-attacks-are-stealing-data-as-well-as-encrypting-it/ (last visited Oct. 2, 2023).

[12]    Center for Internet Security, *Ransomware: The Data Exfiltration and Double Extortion Trends*, available at: https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends (last visited Oct. 2, 2023).

[13]    *Id.*

have been exfiltrated."[14]

36.    An increasingly prevalent form of ransomware attack is the encryption+exfiltration attack in which the attacker encrypts a network and exfiltrates the data contained within. In the third quarter of 2020, "[a]lmost 50% of ransomware cases included the threat to release exfiltrated data along with encrypted data."[15] Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[16] And even where companies pay for the return of data, attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[17]

37.    Defendant was aware that it was vulnerable to this type of attack because the IT vendor that it relied upon, Okta, had warned of "a consistent pattern of social engineering attacks against [] IT service desk personnel, in which the caller's strategy was to convince service desk personnel to reset all Multi-factor Authentication (MFA) factors enrolled by highly privileged users." Once Okta even published preventative tips to its consumers on how to prevent the type of impersonation attack suffered by Defendant and instructed consumers to:

- Protect sign-in flows by enforcing phishing-resistant authentication with Okta FastPass and FIDO2 WebAuthn.

- Configure Authentication Policies (Application Sign-on Policies) for access to privileged applications, including the Admin Console, to require re-authentication "at every sign-in."

- If using self-service recovery, initiate recovery with the strongest available authenticator (currently Okta Verify or Google Authenticator), and limit recovery flows to trusted networks (by IP, ASN or geolocation).

---

[14]    Financial Post, *Threat group posts files allegedly from Canadian military college*, available at:    https://financialpost.com/technology/tech-news/threat-group-posts-files-allegedly-from-canadian-military-college (last accessed Oct. 2, 2023).

[15]    Coveware.com, *Ransomware Demands continue to rise as Data Exfiltration becomes common, and Maze subdues*, https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report (last accessed Oct. 2, 2023).

[16]    *Id*.

[17]    *Id*.

- Review and consolidate the use of Remote Management and Monitoring (RMM) tools by help desk personnel, and block execution of all other RMM tools.

- Strengthen help desk identity verification processes using a combination of visual verification, delegated Workflows in which helpdesk personnel issue MFA challenges to verify a user's identity, and/or Access Requests that require approval by a user's line manager before factors are reset.

- Turn on and test New Device and Suspicious Activity end-user notifications.

- Review and limit the use of Super Administrator Roles - Implement privileged access management (PAM) for Super Administrator access, and use Custom Admin Roles for maintenance tasks and delegate the ability to perform high-risk tasks.

- All Administrative roles in Okta can be constrained to a specific group. We recommend using Custom Admin Roles to create help desk roles with the least privileges required in your organization, and to constrain these roles to groups that exclude highly privileged administrators.

- Enforce dedicated admin policies - Require admins to sign-in from managed devices and via phishing resistant MFA (Okta FastPass, FIDO2 WebAuthn). Restrict this access to trusted Network Zones and deny access from anonymizing proxies.[18]

38.     Despite these warnings, Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class members, allowing the attackers free access to the PII stored therein. Defendant failed to properly verify the credentials of the attacker and failed to have in place systems to prevent and detect the ransomware attack.

39.     The attacker accessed and acquired at least 6 terabytes of information from Defendant's files, which on information and belief, contained unencrypted PII of Plaintiff and Class members, including their Social Security numbers and other sensitive information. Plaintiff's and Class members' PII was accessed and stolen in the Data Breach.

---

[18] Okta, *Cross-Tenant Impersonation: Prevention and Detection* (Aug. 31, 2023), available at: https://sec.okta.com/articles/2023/08/cross-tenant-impersonation-prevention-and-detection (last visited Oct. 2, 2023).

40.     Plaintiff further believes his PII, and that of Class members has been or will be sold on the dark web, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type.

**C.  *Defendant Acquires, Collects, and Stores Plaintiff's and Class Members' PII***

41.     Defendant collected, retained, and stored the PII of Plaintiff and Class members and derived a substantial economic benefit from that PII. But for the collection of Plaintiff's and Class members' PII, Defendant would be unable to perform its services.

42.     By obtaining, collecting, and storing the PII of Plaintiff and Class members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

43.     Plaintiff and Class members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

44.     Defendant could have prevented this Data Breach by properly securing its network and encrypting the files and file servers containing the PII of Plaintiff and Class members.

45.     Defendant made promises to Plaintiff and Class members to safely maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

**D.  *Defendant Knew or Should Have Known of the Risk Because Institutions in Possession of PII Are Particularly Susceptible to Cyber Attacks***

46.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the breach.

47.     Data thieves regularly target companies like Defendant due to the highly sensitive information in their custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminals who seek to illegally monetize that PII through unauthorized access.

48.     In 2021, a record 1,862 data breaches occurred, resulting in approximately

293,927,708 sensitive records being exposed, a 68% increase from 2020.[19]

49.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII that it collected and maintained would be targeted by cybercriminals.

50.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class members from being compromised.

51.     Moreover, Defendant was, or should have been, aware of the foreseeable risk of a cyberattack, like the one it experienced. Not only did Okta publish a warning directly warning of this type of attack but in 2022, BetMGM, LLC, which is owned and operated by Defendant, experienced a data breach in 2022.[20] Since then the records of over 1.5 million BetMGM consumers have been offered for sale on the dark web.[21]

52.     Accordingly, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class members as a result of a breach.

53.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to, upon information and belief, potentially millions of individuals' detailed PII and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

[19]   Identity Theft Resource Center, *2021 Data Breach Report*, available at: https://www.idtheftcenter.org/wp-content/uploads/2022/04/ITRC_2021_Data_Breach_Report.pdf (last visited Oct. 2, 2023).
[20]       https://apps.web.maine.gov/online/aeviewer/ME/40/ef5d2df4-691f-4471-b476-5459bf590bae.shtml (last visited Oct. 2, 2023).
[21]    Cybercrime, *BetMGM Confirms Breach as Hackers Offer to Sell Data of 1.5 Million Customers*, https://www.securityweek.com/betmgm-confirms-breach-hackers-offer-sell-data-15-million-customers/ (last visited Oct. 2, 2023).

54.     The injuries to Plaintiff and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class members.

55.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

**E.  *Value of Personally Identifiable Information***

56.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[22] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[23]

57.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[24]

58.     60. For example, PII can be sold at a price ranging from $40 to $200.[25] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[26]

59.     Moreover, Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to

---

[22]    17 C.F.R. § 248.201 (2013).
[23]    *Id.*
[24]    Digital Trends, *Your personal data is for sale on the dark web. Here's how much it costs* (Oct. 16, 2019), available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 2, 2023).
[25]    Experian, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 2, 2023).
[26]    VPNOverview, *In the Dark*, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visitied Oct. 2, 2023).

change. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[27]

60.     Driver's license numbers, which were likely compromised in the Data Breach, are incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[28]

61.     A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[29]

62.     According to national credit bureau Experian:

> Your driver's license may not seem like a jackpot for thieves, but it can be used to create fake driver's licenses, open accounts in your name, avoid traffic tickets or collect government benefits such as unemployment checks. Worse, if your license data has been stolen in a data breach, you may not even know it's being misused.

> The information from more than 150 million U.S. driver's licenses have been compromised in a data breach or failure to secure a database since 2017, according to the Identity Theft Resource Center.[30]

63.     According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless

---

[27]     Social Security Administration, *Identity Theft and Your Social Security Number* (July 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 2, 2023).

[28]     Forbes, *Hackers Stole Customers' License Numbers From Geico In Months-Long Breach* (Apr. 20, 2021), available at: https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=488c06448658 (last visited Oct. 2, 2023).

[29]     *Id.*

[30]     Experian, *What Should I Do if My Driver's License Number Is Stolen?* (Nov. 3, 2021), available at: https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/ (last visited Oct. 2, 2023).

piece of information to lose if it happens in isolation."[31] However, this is not the case. As cybersecurity experts point out:

> "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[32]

64.   Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[33]

65.   Based on the foregoing, the information at issue in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

66.   This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[34]

67.   Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

68.   The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also

---

[31]   CPO Magazine, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims* (Apr. 23, 2021), available at: https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last visited Oct. 2, 2023).
[32]   *Id.*
[33]   The New York Times, *How Identity Thieves Took My Wife for a Ride* (Apr. 27, 2021), available at:   https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited Oct. 2, 2023).
[34]   Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), available at: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 2, 2023).

---

CLASS ACTION COMPLAINT

-14-

between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[35]

**F.  Defendant Failed to Comply with FTC Guidelines**

69.     Federal and State governments have likewise established security standards and issued recommendations to prevent and limit the impact of data breaches and the resulting harm to consumers and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[36] Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an 'unfair practice' in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

70.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[37] The guidelines note businesses should protect the personal consumer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming

---

[35]    Report to Congressional Requesters, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf ("GAO Report") (last visited Oct. 2, 2023).

[36]    Federal Trade Commission, *Start With Security: A Guide for Business*, *available at*: https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Oct. 2, 2023).

[37]    Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, *available at*: https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Oct. 2, 2023).

traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

71.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

72.     The FTC has brought enforcement actions against businesses for failing to protect consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

73.     As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

74.     Defendant was at all times fully aware of its obligation to protect the personal and financial data of Plaintiff and Class members. Defendant was also aware of the significant repercussions when it failed to do so.

**G. *Defendant Failed to Comply with Industry Standards***

75.     As noted above, experts studying cybersecurity routinely identify entertainment companies as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

76.     Some industry best practices that should be implemented by entertainment companies dealing with sensitive PII, like Defendant, include but are not limited to: educating all

employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

77.     Other best cybersecurity practices that are standard in the entertainment industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

78.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness. Defendant failed to comply with these accepted standards in the entertainment industry, thereby permitting the Data Breach to occur.

**H. *Defendant Breached Its Duty to Safeguard Plaintiff's and Class members' PII***

79.     In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Class members.

80.     Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems

and, ultimately, the theft of Plaintiff's and Class members' confidential PII.

**I.  *Common Injuries and Damages***

81.     As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class members has materialized and is present and continuing, and Plaintiff and Class members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their PII; (e) invasion of privacy; and (f) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class members' PII.

**J.  *The Data Breach Increases Victims' Risk of Identity Theft***

82.     Plaintiff and Class members are at a heightened risk of identity theft for years to come.

83.     The unencrypted PII of Plaintiff and Class members will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class members. Unauthorized individuals can easily access the PII of Plaintiff and Class members.

84.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

85.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

86.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

87.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[38]

88.     With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

89.     The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[38]     "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/tag/fullz/ (last visited Oct. 2, 2023).

90.     The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class members.

91.     Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

92.     Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**K.  *Loss Of Time to Mitigate Risk of Identity Theft and Fraud***

93.     As a result of the recognized risk of identity theft, when a data breach occurs, and an individual learns that their PII was compromised, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

94.     Plaintiff and Class members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as researching and verifying the legitimacy of the Data Breach.

95.     These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[39]

96.     These efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[40]

---

[39]     *See* GAO Report *supra* n.35.
[40]     *See* Federal Trade Commission, Identity Theft.gov, https://www.identitytheft.gov/Steps (last visited Oct. 2, 2023).

97.     And for those Class members who experience actual identity theft and fraud, the GAO Report notes that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[41]

## L. *Diminution of Value of PII*

98.     PII is a valuable property right.[42] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts that include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

99.     An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[43]

100.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[44]

101.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[45]

102.    Conversely, sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[46]

103.    As a result of the Data Breach, Plaintiff's and Class members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by

---

[41]    GAO Report *supra* n.35.

[42]    *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[43]    David Lazarus, *Column: Shadowy data brokers make the most of their invisibility cloak*, LOS ANGELES TIMES, available at: https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Oct. 2, 2023)

[44]    *See*, e.g., https://datacoup.com/;

[45]    Nielsen Computer & Mobile Panel, Frequently Asked Questions, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Oct. 2, 2023).

[46]    Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Oct. 2, 2023).

its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the PII has been lost, thereby causing additional loss of value.

104.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class members as a result of a breach.

105.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to, upon information and belief, millions of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

106.    The injuries to Plaintiff and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class members.

**M.** ***Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

107.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes ——e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

108.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's

authentic tax return is rejected.

109.    Consequently, Plaintiff and Class members are at a present and continuous risk of fraud and identity theft for many years into the future.

110.    The retail cost of credit monitoring and identity theft monitoring can be around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost that Plaintiff and Class members would not need to bear but for Defendant's failure to safeguard their PII.

**N.  *Loss of the Benefit of the Bargain***

111.    Furthermore, Defendant's poor data security deprived Plaintiff and Class members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for products and/or services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class members received products and/or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

**O.  *Plaintiff's Experience***

112.    Plaintiff is a current MGM Rewards member.

113.    In order to obtain an MGM Rewards membership, Plaintiff was required to provide his PII to Defendant, including his name, date of birth, contact information, and Social Security number.

114.    Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff's PII in its system.

115.    Plaintiff is very careful about sharing his sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had he known of Defendant's lax data security policies.

116.    As a result of the Data Breach, and at the direction of Defendant's Notice, Plaintiff

made reasonable efforts to mitigate the impact of the Data Breach, including changing his debit card pin number and monitoring his financial accounts for fraudulent activity. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

117.    Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

118.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed his of key details about the Data Breach's occurrence.

119.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

120.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

121.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V.    CLASS ALLEGATIONS

122.    Plaintiff brings this action individually and on behalf of all others similarly situated pursuant to rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

123.     Specifically, Plaintiff proposes the following class definition, subject to amendment as appropriate:

> All individuals in the United States whose PII was disclosed in the Data Breach (the "Class").

124.     Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

125.     Plaintiff reserves the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

126.     The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

127.     <u>Numerosity</u>. The Class members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes that the proposed Class includes potentially millions of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff but may be ascertained from Defendant's records.

128.     <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a.   Whether Defendant engaged in the conduct alleged herein;

b.   Whether Defendant's conduct violated the FTCA;

c.   When Defendant learned of the Data Breach;

d.   Whether Defendant's response to the Data Breach was adequate;

e.   Whether Defendant unlawfully shared, lost, or disclosed Plaintiff's and Class members' PII;

f.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII

compromised in the Data Breach;

g.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.  Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

i.  Whether Defendant owed a duty to Class members to safeguard their PII;

j.  Whether Defendant breached its duty to Class members to safeguard their PII;

k.  Whether hackers obtained Class members' PII via the Data Breach;

l.  Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class members;

m.  Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class members;

n.  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

o.  What damages Plaintiff and Class members suffered as a result of Defendant's misconduct;

p.  Whether Defendant's conduct was negligent;

q.  Whether Defendant was unjustly enriched;

r.  Whether Plaintiff and Class members are entitled to actual and/or statutory damages;

s.  Whether Plaintiff and Class members are entitled to additional credit or identity monitoring and monetary relief; and

t.  Whether Plaintiff and Class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

129.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class members because, *inter alia*, all Class

members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class members arise from the same operative facts and are based on the same legal theories.

130.   <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

131.   <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class members in that all of Plaintiff's and Class members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

132.   <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

133.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

134.   Finally, all members of the proposed Class are readily ascertainable. Defendant

has access to the names and addresses and/or email addresses of Class members affected by the Data Breach.

## COUNT I
### Negligence and Negligence *Per Se*
### (On Behalf of Plaintiff and the Class)

135.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

136.    Defendant requires its consumers, including Plaintiff and Class members, to submit non-public PII in the ordinary course of providing its services.

137.    Defendant gathered and stored the PII of Plaintiff and Class members as part of its business of soliciting its services to its consumers, which solicitations and services affect commerce.

138.    Plaintiff and Class members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

139.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class members could and would suffer if the PII were wrongfully disclosed.

140.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

141.    Defendant had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

142.    Defendant owed a duty of care to Plaintiff and Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

143.    Defendant's duty of care to use reasonable security measures arose as a result of

the special relationship that existed between Defendant and Plaintiff and Class members. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of being consumers of Defendant.

144.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

145.   Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

146.   Defendant also had a duty to exercise appropriate clearinghouse practices to remove former consumers' PII it was no longer required to retain pursuant to regulations.

147.   Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

148.   Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

149.   Defendant breached its duties, pursuant to the FTCA and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

      a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' PII;

      b.  Failing to adequately monitor the security of their networks and systems;

      c.  Allowing unauthorized access to Class members' PII;

      d.  Failing to detect in a timely manner that Class members' PII had been compromised;

      e.  Failing to remove former consumers' PII it was no longer required to retain

pursuant to regulations; and

f.   Failing to timely and adequately notify Class members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

150.   Defendant violated Section 5 of the FTCA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class. Plaintiff and Class members were within the class of persons the FTCA was intended to protect and the type of harm that resulted from the Data Breach was the type of harm it was intended to guard against. 155.

151.   Defendant's violation of Section 5 of the FTCA constitutes negligence per se.

152.   The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

153.   A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

154.   It was foreseeable that Defendant's failure to use reasonable measures to protect Class members' PII would result in injury to Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the entertainment industry.

155.   Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

156.   Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

157. It was therefore foreseeable that the failure to adequately safeguard Class members' PII would result in one or more types of injuries to Class members.

158. Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

159. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

160. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

161. Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

162. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

163. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

164. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b)

remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

165.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

166.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

167.    Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

168.    Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class members in an unsafe and insecure manner.

169.    Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class members.

### COUNT II
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

170.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

171.    Plaintiff and Class members were required to provide their PII to Defendant as a condition of receiving services and loyalty program membership from Defendant.

172.    Plaintiff and the Class entrusted their PII to Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and

accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

173.    In entering into such implied contracts, Plaintiff and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

174.    Implicit in the agreement between Plaintiff and Class members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

175.    The mutual understanding and intent of Plaintiff and Class members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

176.    Defendant solicited, offered, and invited Plaintiff and Class members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class members accepted Defendant's offers and provided their PII to Defendant.

177.    In accepting the PII of Plaintiff and Class members, Defendant understood and agreed that it was required to reasonably safeguard the PII from unauthorized access or disclosure.

178.    On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

179.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class members' PII would remain protected.

180.    Plaintiff and Class members paid money and provided their PII to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

181.     Plaintiff and Class members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

182.     Plaintiff and Class members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

183.     Plaintiff and Class members fully and adequately performed their obligations under the implied contracts with Defendant.

184.     Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

185.     As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

186.     Plaintiff and Class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

187.     Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

**<u>COUNT III</u>**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

188.     Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

189.     This count is pleaded in the alternative to the Breach of Implied Contract claim above (Count II).

190.     Plaintiff and Class members conferred a monetary benefit on Defendant.

Specifically, they paid for services from and enrolled in loyalty program membership with Defendant and in so doing also provided Defendant with their PII. In exchange, Plaintiff and Class members should have received from Defendant the services that were the subject of the transaction and should have had their PII protected with adequate data security.

191.    Defendant knew that Plaintiff and Class members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiff's retained data and used Plaintiff's and Class members' PII for business purposes.

192.    Defendant failed to secure Plaintiff's and Class members' PII and, therefore, did not fully compensate Plaintiff or Class members for the value that their PII provided.

193.    Defendant acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

194.    If Plaintiff and Class members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would have entrusted their PII at Defendant or obtained loyalty program membership at Defendant. 199. Plaintiff and Class members have no adequate remedy at law.

195.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class members conferred upon it.

196.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

197.    Plaintiff and Class members are entitled to full refunds, restitution, and/or damages

from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class members may seek restitution or compensation.

198.   Plaintiff and Class members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and Class members, requests judgment against Defendant and that the Court grant the following:

A.   For an Order certifying the Class, and appointing Plaintiff and Plaintiff's counsel to represent such Class;

B.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class members;

C.   For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class members, including but not limited to an order:

 i.   prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

 ii.   requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

 iii.   requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and

Class members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class members;

v. prohibiting Defendant from maintaining the PII of Plaintiff and Class members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class members;

xii.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.   requiring Defendant to meaningfully educate all Class members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third- party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of damages, including actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

1   F.      For prejudgment interest on all amounts awarded; and

2   G.      Such other and further relief as this Court may deem just and proper.

3                          **<u>DEMAND FOR JURY TRIAL</u>**

4   Plaintiff hereby demands that this matter be tried before a jury.

5   DATED: October 3, 2023                    Respectfully Submitted,

6

7                                             **LEON GREENBERG PC**
                                              */s/ Leon Greenberg*
8                                             LEON GREENBERG
                                              State Bar Number: 8094
9                                             1811 South Rainbow Boulevard # 210
                                              Las Vegas, Nevada 89146
10                                            Telephone: (702) 383-6085
                                              Facsimile: (702) 385-1827
11                                            ranni@overtimelaw.com

12                                            RACHELE R. BYRD
                                              (*pro hac vice forthcoming*)
13                                            **WOLF HALDENSTEIN ADLER**
                                              **  FREEMAN & HERZ LLP**
14                                            750 B Street, Suite 1820
15                                            San Diego, CA 92101
                                              Telephone: (619) 239-4599
16                                            Facsimile:  (619) 234-4599
                                              byrd@whafh.com
17

18                                            JON TOSTRUD
                                              ANTHONY CARTER
19                                            (*pro hac vices forthcoming*)
                                              **TOSTRUD LAW GROUP, PC**
20                                            1925 Century Park East, Suite 2100
                                              Los Angeles, CA 90067
21                                            Telephone:  310/278-2600
22                                            Facsimile:   310/278-2640
                                              jtostrud@tostrudlaw.com
23                                            acarter@tostrudlaw.com

24                                            ERIK LANGELAND
25                                            (*pro hac vice forthcoming*)
                                              **ERIK H. LANGELAND, P.C.**
26                                            733 Third Avenue, 16th Floor
                                              New York, N.Y. 10017
27                                            Telephone: (212) 354-6270
                                              elangeland@langelandlaw.com
28
                                              *Attorneys for Plaintiff and the Proposed Class*

---

CLASS ACTION COMPLAINT
-39-